IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:26-cv-23010

MARC J. GOLDNER, Goldner Blatt Investments, LLC, Rachel Korsen, Simon Divilov, Jasmine Garcia, and The Dharma Initiative, LLC,

Plaintiffs,

v.

ELI M. BLATT, MegaCap Capital, LLC, MegaCap Funds, LP, MegaCap Funds, LP – Tech Holding, MegaCap Funds, LP – Tech I, MegaCap Funds, LP – SpaceX I, Anthropos, LLC, Mythic Alpha, LLC, Thinkable, LLC, Michael Elkins, Wayaca, LLC, Flow, Inc., BitSource, LLC, JPMorgan Chase & Co., and Bank of America Corporation,

Defendants.
_________________________________________/

**PLAINTIFF MARC J. GOLDNER'S OPPOSITION TO FLOW INC.'S MOTION TO DISMISS OR TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Plaintiff Marc J. Goldner opposes Defendant Flow, Inc.'s Motion [DE 75]. Counts XXXIII through XXXV allege that Flow accepted specific safeguards protecting Goldner's interests, knowingly helped Mr. Blatt bypass those safeguards, assured Mr. Goldner that it would honor approval controls, and suspend work pending clear guidance about lawful control. The Complaint identifies the communications, Flow personnel, approval requirements, and acts supporting each claim. Flow argues that Mr. Elkins's letter defeats any plausible inference of knowing misconduct. That argument does not account for Flow's earlier acknowledgments or the full range of later alleged acts. Flow knew of Mr. Goldner's LP interest and accepted dual approval ***before*** the control dispute. Mr. Elkins's later request to finalize K-1s with Mr. Blatt did not adjudicate ownership, resolve competing authority, or authorize exclusion from Goldner's LP interest. The Complaint alleges further acts beyond that request and after renewed notice.

Arbitration requires separate proof of who may enforce each agreement and which claims depend on it. Goldner invokes direct undertakings and independent tort duties, not beneficiary status under MegaCap Capital, LLC's ("MCC") Service Agreement. The present counts also use selected factual ranges and identify his LP rights of TECH. The Court should deny the motion.

**RELEVANT BACKGROUND**

Flow dealt directly with Mr. Goldner long before June 2023. The Complaint describes communications beginning in 2021 and identifies Mr. Goldner as both an MCC managing member ***and*** a Limited Partner ("LP") of MegaCap Funds, LP – Tech Holding ("MCTH"). Compl. ¶¶ 1104–14, 1141–46, 1886–87. On June 19, 2022, Mr. Goldner instructed Flow that documents and transactions required both his and Mr. Blatt's authorization. Mr. Blatt confirmed the unanimous-consent requirement, and Flow's Michael Guidi responded on June 20, 2022 that Flow would make the change ***effective immediately*** and obtain Mr. Goldner's signature ***before*** beginning specified

bank setups. *Id.* ¶¶ 1108–10, 1892–93; Ex. 59. Flow thus acknowledged the restriction with both principals' agreement. Flow had accepted these controls nearly a year ***before*** the June 2023 dispute and ***before*** Mr. Blatt excluded Mr. Goldner.[1]

Flow repeatedly recognized the same control. Ryan Nanney required both principals' approval to revise MegaCap Funds, LP – Tech I's ("MCTI") return on December 16, 2022, and Mr. Goldner's express approval to file on January 12, 2023. *Id.* ¶¶ 1888, 1905, 1910, 1916. On February 3, Mr. Goldner directed Flow to prepare K-1s using 0.5% expenses and await approval before distributing them. Mr. Blatt confirmed that direction. *Id.* Ex. 65; First Action, DE 182-3 at 2.[2] That email authorized preparation and reserved approval for distribution. The Complaint challenges K-1s and filings that departed from the April-approved terms or lacked Mr. Goldner's required approval. Compl. ¶¶ 1133–35, 1895, 1908(c), 1910, 1917(e); Exs. 44, 65; Ex. 46 at 2.[3]

On June 1, 2023, after acknowledging Mr. Goldner's cease-and-desist demand, Mr. Nanney said Flow would suspend portfolio work until it received clear guidance about lawful control. Mr. Goldner alleges that Flow instead resumed exclusive work with Mr. Blatt after receiving Elkins's *disputed* letter. Compl. ¶¶ 721–28, 1147–49, 1918.[4] That is not clear guidance.

---

[1] Blatt confirmed Goldner's role on October 10, 2022: "Guys, I am removing myself from this process. Marc is now in control…" Compl. ¶ 1118. That communication supports the allegation Flow knowingly dealt with Goldner as MCC's authorized representative; it does not require treating him individually as a GP entity. The Service Agreement itself contemplates supervision by MCC or its designees and a designated primary contact. DE 75, Ex. A §§ 2.1, 4.1.

2 "First Action" refers to *Blatt v. Goldner*, No. 1:23-cv-24819-DPG. Flow's original motion, Mr. Goldner's opposition, and Flow's reply appear at DE 182, DE 192, and DE 198. The prior exhibits identify the communications Flow submitted with its original motion. The Elkins letter discussed below also underlies Complaint paragraphs 722–728 and Flow's current motion. Its contents establish what Elkins asserted, without proving those disputed assertions.

[3] On April 27, Mr. Goldner asked Mr. Blatt to approve the corrected K-1s. Blatt agreed on April 28 if taxable income was 10% of the total fee, which it was. Compl. ¶¶ 1133–35; Ex. 44. Mr. Goldner again requested review and confirmation in the exhibit's May 5 email. The challenged later K-1s allegedly departed from the April terms approved with Nanney or lacked the required authorization. Compl. ¶¶ 1895, 1908(c), 1910, 1917(e); Exs. 44, 65; Ex. 46 at 2.

[4] On May 31, 2023, Mr. Goldner sent a cease-and-desist demand, which Flow acknowledged on June 1. That day, Mr. Nanney emailed both principals that Flow would not respond individually or work on the portfolio until it received "clear guidance on who legally is in charge for MegaCap Capital." Compl. ¶¶ 721, 1147–49, 1918; Ex. 45. Mr. Goldner understood that both principals' access was restricted pending legal resolution, so Flow would not give Mr. Blatt sole

Further, Flow overstates the contents of Elkins's letter, which only requested K-1 work with Blatt and did not purport to decide the principals' dispute as Flow seems to intimate. Goldner protested on June 7 and 26, and Reichard renewed the demands in September. [5] Compl. ¶¶ 1150–52, 1175–79; Ex. 46.[6] Goldner alleges continuing personal LP rights, interference with his allocated 8,217-share-equivalent interest, and efforts to protect those rights through demands, counsel, and litigation. Compl. ¶¶ 642, 1173–74, 1886–87, 1895–99, 1904, 1929(d)–(e).[7]

## LEGAL STANDARD

Rule 12(b)(6) requires factual allegations that support a plausible claim and the Court accepts those allegations as true and draws reasonable inferences for the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The Court may consider a document central to the claim if the parties do not dispute its authenticity. *SFM Holdings, Ltd. v. Banc of America Securities, LLC*, 600 F.3d

---

use of the platform or issue K-1s at his direction. Compl. ¶¶ 1917(d)–(e), 1923–25, 1928. Mr. Elkins prepared a letter dated June 2 asserting that Mr. Blatt had removed Mr. Goldner as a voting member and manager. Mr. Blatt forwarded it to Flow on June 6. The Complaint alleges that Flow then resumed work exclusively with Blatt. Compl. ¶¶ 722–28.

[5] Fatal to their version, if a letter from one attorney was sufficient to establish "clear guidance," then a countervailing letter would be, by their stated standards, sufficient to negate it. Instead of keeping to their undertaking that they would wait for legal guidance, now only available in the form of formal adjudication, Flow unequivocally admits they actively elected to continue to assist Blatt despite their actual knowledge that Blatt's authority is dubious and that there is a credible dispute over the control of MCC and the MegaCap Related Entities including Limited Partnerships.

[6] The letter itself requests that Flow work with Mr. Blatt to finalize K-1s and recognizes that the principals have dispute-resolution procedures available. It does not decide their dispute or direct the cancellation of Mr. Goldner's LP interest ***or*** access. First Action, DE 182-7 at 2. Mr. Goldner sent demand letters on June 7 and June 26. Compl. ¶¶ 1150–52. On September 11, 2023 attorney Raul Reichard challenged Flow's July 26 correspondence with Mr. Blatt and invoked Mr. Nanney's June 1 assurance. He identified the April-approved K-1 terms, demanded Mr. Goldner's written approval before releasing accounting records, and sought restoration of his back-end and investor-portal access. Compl. ¶¶ 1175–76; Ex. 46 at 1–2, 4. After Flow responded on September 12, Mr. Reichard renewed the demands for authorization, inclusion in communications, and dual access on September 13. Compl. ¶¶ 1177–79. These demands sought compliance with the safeguards and gave Flow further notice of the challenged conduct.

[7] The resulting claims identify injuries to Mr. Goldner personally, including denial of access to his MCTH limited partnership interest, withholding of his own tax documentation (still to this day), and interference with his rights through Flow's portal. Compl. ¶¶ 1173–74, 1895–99, 1906, 1908(b), 1911, 1929(d)–(e). The Complaint alleges that he remains an MCTH limited partner, not merely that he once was one. Compl. ¶¶ 1886–87, 1899, 1904. It links that interest to the February 2023 Resolutions' individual allocation of an interest equivalent to 8,217 TECH shares held *through* MCTH. Mr. Goldner also pursued claims against Mr. Blatt and Flow in the First Action. *See id.* ¶ 642; First Action, DE 192 at 1–2. His demands, counsel's correspondence, and litigation reflect his efforts to protect those rights.

1334, 1337–39 (11th Cir. 2010). A lawyer's letter establishes what the lawyer said, without proving disputed assertions about ownership or authority. Rule 9(b) requires particularity in pleading fraud and permits general allegations of knowledge and intent, subject to plausibility. *Iqbal*, 556 U.S. at 686; *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290–91 (11th Cir. 2010).[8] Arbitration presents a separate contractual inquiry under a "summary-judgment-like standard." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346–47 (11th Cir. 2017). State law determines if a nonsignatory may enforce, or be bound by, the agreement. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). The breadth of a clause does not eliminate that threshold.

## I. THE COMPLAINT ALLEGES INJURY TO GOLDNER'S INDIVIDUAL RIGHTS

Flow's direct versus derivative argument does not dispose of all three counts. Under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, the Court asks "who suffered the alleged harm" and who would receive the recovery. 845 A.2d 1031, 1033, 1033, 1039 (Del. 2004). The Court applies those questions to each asserted injury. Flow acknowledges Goldner alleges narrower personal injuries but addresses them under its other grounds. DE 75 at 9. Those injuries require their own analysis.

Goldner alleges deprivation of access to his own LP interest and information, withholding of his individual K-1s, and violation of safeguards Flow accepted in direct dealings with him. Compl. ¶¶ 1891–99, 1906, 1908(b), 1911. Count XXXV additionally alleges deception directed to Goldner and his reliance on Flow's assurances of impartial administration and protection of his LP interest. *Id.* ¶¶ 1918–23, 1928–29. Restoration of his access and compensation for injury caused by deception of him would benefit Goldner. An entity's recovery for depletion of its assets would

[8] *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300–01 (11th Cir. 2024), permits consideration of a central, authentic document even if the complaint did not reference it. Mr. Goldner therefore does not seek exclusion merely because Flow attached a contract to its motion. He contests treating the contract as dispositive (when there are multiple Flow agreements with MegaCap) of later undertakings, disputed authority, or his personal consent to arbitration. If resolving the tort claims requires other outside evidence, Rule 12(d) requires exclusion or conversion with a reasonable opportunity to present pertinent material. That rule is distinct from the evidentiary inquiry on arbitration.

not itself restore those individual rights or compensate that reliance injury. Those allegations concern rights personal to Goldner even though the dispute may also involve injury to an entity.

Section 17-701 distinguishes a partner's personal property interest in the partnership from the ownership of particular partnership assets. 6 Del. C. § 17-701. Goldner's theory respects that distinction: the TECH references identify the investment represented by *his* personally held MCTH interest, that is, held in his individual, private capacity. The personal wrong alleged is Flow's assistance in depriving *him*, in his personal capacity, of that interest, as well as his ability to access and exercise rights associated with it. Compl. ¶¶ 1173–74, 1899, 1906, 1908(b). The Court need *not* treat him as direct legal owner of *all* securities held by MCTH to recognize those allegations.[9]

The Partnership Agreement's management provisions preserve this distinction. Sections 5.1 and 6.2 place management with MCC as general partner and restrict an LP acting in that capacity. They do ***not*** resolve who could act for MCC under MCC's own governance documents. Mr. Goldner has two "identities" in these dealings: an individual MCTH Limited Partner ***and*** an MCC managing member acting for the General Partner as its designee. He alleges that Flow accepted dual authorization from MCC's two principals: Goldner and Blatt. Compl. ¶¶ 1108–10, 1907. That approval role rests on MCC's OA, MOU, and February 2023 Resolutions, which govern how MCC exercised its powers. *Id.* ¶¶ 194–96, 1907. These individual injuries supply the basis for opposing dismissal. References to diverted entity funds, general diminution in entity value, and unauthorized subscriptions do not erase the separately pleaded injuries. The Court can

[9] The February 2023 Resolutions supply a specific source for the personal allocation. Complaint paragraph 855 quotes Exhibit 1, page 4, assigning each member a portion of the MCTH option corresponding to 8,217 shares of derivative TECH equity. Paragraph 856 quotes Exhibit 1, page 11, permitting each member to choose an MCTH LP interest without further General Partner or member consent and making the allocated option ***irrevocable***. Paragraphs 769–71 and 857 allege completion of the required agreements and Mr. Goldner's entitlement. The claim concerns deprivation of his assigned option, LP interest, and associated access, not simply a pro rata share of losses to MCTH's assets. The individual allocation does not convert every injury to partnership property into a direct claim under the allegations.

assess the permissible measure of recovery for each proven wrong without dismissing claims seeking redress for Goldner's own loss of access, rights, and reliance based injury.[10]

## II. FLOW'S ACCEPTED UNDERTAKINGS SUPPORT FIDUCIARY DUTY CLAIM

Count XXXIII alleges a relationship of accepted trust, breach, and resulting injury. Compl. ¶¶ 1886–1900. Florida recognizes an implied fiduciary relationship when the circumstances show that one party accepted the other's confidence and undertook to act for that party's benefit. A conventional commercial relationship does not alone establish that undertaking, but additional dealings and responsibilities can. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 207–09 (Fla. 3d DCA 2003) ("Because of the factually intensive nature of an implied fiduciary duty inquiry, such claims are better addressed by a summary judgment motion, or at trial, than on a motion to dismiss.".) Flow accepted dual approval, repeatedly required Mr. Goldner's authorization, and clearly knew of his personal LP interest. Those dealings support the claimed undertaking. Compl. ¶¶ 1108–10, 1887–88, 1892–95, 1899, 1904, 1910.[11]

Flow states: "But MCC retained Flow; Goldner did not." DE 75 at 10. That identifies the contracting client; it does ***not*** answer whether Flow later accepted defined responsibilities toward Mr. Goldner, which they did. An implied fiduciary relationship turns on the responsibilities Flow accepted and the parties' dealings, not solely on who signed the original engagement. *Weinberg v. Advanced Data Processing, Inc.,* 147 F.Supp.3d 1359, 1367 (S.D. Fla. 2015) (quoting Doe v.

---

[10] If the Court determines that a particular injury belongs to MCTH or MCC, Mr. Goldner requests leave to plead that injury in the proper derivative capacity, subject to Rule 23.1, the applicable entity law, standing, and demand requirements. That alternative does not concede that his assigned rights, personal access, or reliance injuries belong to an entity. He seeks no double recovery. Any derivative claim would require amendment.

[11] Mr. Goldner specified dual authorization, Mr. Blatt agreed, and Mr. Guidi confirmed immediate implementation. Mr. Nanney then proceeded without Mr. Goldner's express approval when, lacking Mr. Goldner's approval ought to have halted all further actions. Compl. ¶¶ 1108–10, 1888, 1892–93, 1910. Flow knew Mr. Goldner's LP interest was affected by its records and access, undertook to safeguard that interest, and had a duty to provide Goldner's tax documents, which they failed to do. Compl. ¶¶ 1114, 1887, 1895, 1899, 1904.

Evans, 814 So.2d 370, 374 (Fla.2002)) ("[A] contractual relationship between the parties is not required to form a fiduciary relationship . . ."). Flow controlled the portal, documents, and approval process. It accepted restrictions protecting Goldner's participation and interests. Those specific responsibilities support the fiduciary claim without making Flow his investment adviser or MCC's replacement manager.

The Service Agreement limits duties it creates towards ***MegaCap*** but does ***not*** conclusively resolve the additional protective responsibilities Flow accepted in later direct dealings with ***Goldner***. DE 75, Ex. A §§ 2.1, 4.1, 9.1(e), 13.1–13.2, 13.6.[12] What requires attention is the actual relationship and contractual limits. SFM Holdings, 600 F.3d at 1339; *Lamm v. State Street Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014). They do not make the label "administrator" dispositive regardless of pleaded conduct. Here the Complaint identifies the additional conduct: express acceptance of dual approval, repeated acknowledgment that Goldner's individual authorization was required, control over his access, and assurances directed to protecting the interests he held. Those allegations distinguish this case from one in which an investor merely expects a custodian to discover another person's wrongdoing.[13] Flow bypassed dual approval, enabled unilateral portal use, withheld Goldner's tax documents, and excluded his LP access.

---

[12] The cited provisions describe administration under MCC's or its designees' supervision, reserve management, disclaim fiduciary duties created by the agreement, and deny third party contractual rights. Mr. Goldner relies on additional responsibilities accepted in subsequent direct dealings, not an assertion that the original engagement appointed Flow his personal fiduciary. Section 13.1 of the Service Agreement addresses what that agreement creates.

[13] The pleaded Form D episode also shows direct operational dealings, rather than a provider unaware of Mr. Goldner's role. On December 22, 2022, Mr. Goldner told Flow that a requested name and information correction remained uncompleted. Ms. Haley Measels acknowledged the unacceptable delay, reported updating the SEC database, described the remaining approval and amendment steps, and requested bank statements. Compl. ¶¶ 1120–21. This episode adds concrete support for Flow's direct ***prior*** operational dealings with Goldner and its knowledge of his role.

Compl. ¶¶ 1144, 1894–99. Those acts breached accepted safeguards and impaired interests they purported to protect.[14]

**III. COUNT XXXIV ALLEGES KNOWING AND SUBSTANTIAL ASSISTANCE**

The aiding and abetting claim requires "(1) an underlying violation on the part of the primary wrongdoer, (2) knowledge of the underlying violation by the aider and abettor, and (3) the rendering of substantial assistance to the wrongdoer by the aider and abettor." *Gevaerts v. TD Bank, N.A.*, 56 F.Supp.3d 1335, 1341 (S.D. Fla. 2014). Count XXXIV identifies Blatt's fiduciary role, self-dealing, unauthorized exclusion, and interference with Goldner's interests, then identifies Flow's knowledge and assistance. Compl. ¶¶ 1902–11.

**A. Flow's own acknowledgments support actual knowledge**

The Court may infer actual knowledge from the pleaded facts. *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097 (11th Cir. 2017). The Eleventh Circuit rejects a heightened "strong inference" requirement for knowledge under Rule 9(b). *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1177–80 (11th Cir. 2025) (the knowledge element can be alleged generally). Facts supporting a ***reasonable*** inference suffice of actual knowledge. *Euclid Turnaround Opportunity Fund LP v. Amerant Equip. Fin.*, 2026 WL 2880668, at *16-17 (S.D. Fla. 2026). Flow acknowledged the approval controls, received the governing documents, and helped override them. Those facts support the required inference. Compl. ¶¶ 1108–10, 1905, 1907, 1910.[15]

[14] Mr. Reichard's September demand identified the approved K-1 terms and required Mr. Goldner's written approval for releases. Compl. Ex. 46 at 2. The Complaint challenges departures from those terms and controls. Compl. ¶¶ 1910, 1917(e). The accepted relationship must be assessed through the full course of dealings, including those expressly assumed responsibilities.

[15] Flow established the approval requirement, received Mr. Blatt's agreement, and repeatedly told Mr. Blatt that Mr. Goldner's approval was required. Compl. ¶¶ 1108–10, 1905, 1910. Paragraph 1907 alleges notice of MCC's Operating Agreement, the February 2023 Resolutions, and dual authorization. Paragraph 1910 identifies subsequent filings departing from the approved 0.5% expense instruction without Mr. Goldner's approval. The inference rests on knowledge of these specific controls and participation in overriding them, not an assumption that every business partnership creates identical fiduciary duties.

Mr. Goldner alleges actual knowledge here: Flow knew the approval process, knew Mr. Goldner's asserted interests and role, and affirmatively enabled unilateral conduct contrary to the controls Flow had accepted. Compl. ¶¶ 1904–10. The identified communications and acts give factual content to the knowledge allegation. A reference elsewhere to a "reason to suspect" does not eliminate the more specific allegations concerning Flow's own acknowledgments and ensuing participation that give rise to the viable claims against Flow.

**B. The Attorney Elkins letter does not conclusively establish innocent conduct**

Flow attempts to hide behind and argues that Mr. Elkins's letter explains why it resumed work and defeats an inference of actual knowledge. DE 75 at 12–13. The Complaint identifies the letter as the reason Flow resumed work, but alleges Flow knew and bypassed the agreed controls. The Court must assess those allegations *together*, including what Flow knew about the particular acts it assisted.[16] The letter's disputed assertion of removal does not resolve that inquiry.[17]

The Elkins letter in question was merely a request to work with Mr. Blatt to finalize K-1s. First Action, DE 182-7 at 2. Despite what Flow intimates, the letter does ***not*** address Mr. Goldner's LP ownership, authorize cancellation of his personal portal access, or resolve whether he should

---

[16] To the extent the Court considers Blatt's standing-hearing materials, his own exhibits also document his effort to enlist Elkins against Goldner. Blatt told Elkins, "And I told you I don't want to hire you for MC if it prevents me from using you against Marc," and "I was counting on you against Marc." DE 21-3 at 91–92, Ex. 26; *see* DE 21-2 ¶ 40. Those statements reinforce why Elkins's disputed position cannot conclusively resolve the principals' competing claims of authority.

[17] Blatt's April 14, 2025 declaration stated: "In response, the attorney drafted a cease and desist letter, attached hereto as Exhibit B." First Action, DE 108-1 at 19, ¶ 125. The later declaration omits that assertion and renumbers the succeeding paragraph as paragraph 125. Compare id., with *Blatt v. Goldner*, No. 9:26-cv-80004, DE 1-1 at 1043, ¶¶ 124–25. The subsequent sanctions motion expressly acknowledges that "[t]he missing paragraph was determined to be inaccurate and removed," while characterizing the change as ordinary revision. Id., DE 50 at 6. Separately, Blatt's standing-hearing evidence records his May 12, 2023 request for a cease-and-desist letter and his offer, "I can make first draft." DE 21-3 at 116, Ex. 33. Blatt's own exhibit records him telling Elkins, "I was counting on you against Marc," and discussing whether retaining Elkins would "present a conflict." DE 21-3 at 91–92 (Ex. 26). The Complaint separately quotes Elkins's acknowledgment of prior personal representation of Blatt and his statement that he would "likely be prevented" from representing either principal against the other in a MegaCap dispute. Compl. ¶ 703. These circumstances further undermine treating Elkins's letter as an independent resolution of the disputed authority.

receive his own tax documents. Those are material distinctions because Count XXXIV alleges assistance in removing Mr. Goldner's access to his LP interest and in consolidating Mr. Blatt's control, as well as unauthorized filings. Compl. ¶¶ 1906, 1908–11. Flow stretches a request to complete tax work beyond what the letter actually contained and then further relies upon that fallaciously expanded content as a catch-all shield to attempt to escape liability.

The Complaint identifies Mr. Elkins's letter as Flow's stated reason for resuming work, without conceding its truth. It also alleges continued conduct after renewed demands and conflicting authority claims. Compl. ¶¶ 725–31, 1150–52, 1175–79; Ex. 46.[18] The later written agreement also documents Flow's continuing portal engagement: the March 1, 2023 Investor Portal Statement of Work provides an initial one-year term and automatic annual renewal. First Action, DE 192-3 at 1–4, §§ 2, 3(a)–(b); *see also Exhibit 1 attached to this Opposition*.

**C. The assistance alleged is affirmative and connected to the injury**

Flow allegedly allowed Mr. Blatt to issue subscription documents to prospective MCTI limited partners through the portal (originating from MCTH's interest), facilitated Mr. Goldner's exclusion while permitting Mr. Blatt's sole access, and created and distributed K-1s that departed from the approved terms. Id. ¶¶ 1144, 1908(a)–(c), 1910, 1917(e), 1924. These acts damage Mr. Goldner in his personal capacity, since, for example, Flow permitted the transfer of Mr. Goldners 8,217 TECH shares to third parties without Mr. Goldner's permission. The aforementioned allegations identify the unilateral acts that Flow's accepted controls were supposed to prevent.

[18] Paragraphs 725–28 identify Mr. Elkins's letter as the event that prompted Flow to resume exclusive work with Mr. Blatt. They do not concede the truth of his position or Flow's lack of actual knowledge. Mr. Goldner also identifies further demands on June 7 and June 26 and later counsel correspondence addressing ongoing exclusion. Compl. ¶¶ 1150–52, 1175–79; Ex. 46 at 1–2, 4. Attorney Muschel's subsequent claim to represent MCC likewise did not adjudicate the competing authority claims. Compl. ¶¶ 729–31. The knowledge inquiry must address the full chronology and each challenged act, including continued conduct ***after*** the additional notices. The letter itself purports to represent MCC and disclaims representing either principal individually. First Action, DE 182-7 at 2. Mr. Goldner disputes that asserted authority. Compl. ¶¶ 722–31, 1752. Regardless, Mr. Elkins was Mr. Blatt's *personal* attorney.

Flow enabled those acts through systems it administered. Paragraphs 1909–11 explain how they enabled Mr. Blatt's continued control and interfered with Mr. Goldner's interests. The claim therefore does not rest solely on a failure to investigate, object, or resolve the principals' dispute. *Chang* distinguishes affirmative assistance from inaction and recognizes that ordinary services can constitute substantial assistance when performed with ***actual knowledge*** of the specific wrong. 845 F.3d at 1098. Its fiduciary duty requirement for mere inaction does not convert affirmative assistance into an inaction claim. Thus, Count XXXIV also requires independent consideration even if the Court questions whether Flow itself became Goldner's fiduciary under Count XXXIII.

## IV. COUNT XXXV IDENTIFIES ASSURANCES AND THE ALLEGED RELIANCE

Fraudulent misrepresentation requires a material false statement concerning a material fact, knowledge of falsity, intent to induce reliance, and injury caused by the recipient's actual reliance. *Mink v. Smith & Nephew, Inc.,* 860 F.3d 1319, 1332 (11th Cir. 2017). Rule 9(b) requires pleading with particularity in alleging fraud. *American Dental*, 605 F.3d at 1291. The Complaint supplies specific communications in addition to its descriptions of Flow's general capabilities.

The Complaint identifies Flow's speakers, dated emails, approval assurances, and the June 1 representation and misrepresentation. Compl. ¶¶ 721, 1108–10, 1910, 1916, 1918; Exs. 45, 59.[19]

[19] Mr. Nanney's June 1, 2023 email to both principals supplies the concrete fraud statement. It announced that Flow would stop individual responses and portfolio work pending clear guidance about lawful control. Compl. ¶¶ 721, 1918; Ex. 45. Paragraphs 1919–20 allege knowing falsity and intended inducement. Paragraphs 1923–28 identify the promised protection, alleged reliance, and Flow's motive to retain MCC's business and fees despite knowing Mr. Goldner wanted another administrator. The earlier emails establish the context of controls Flow had already accepted. Mr. Guidi accepted dual authorization on June 20, 2022, and Nanney required approval on December 16, 2022 and January 12, 2023. Compl. ¶¶ 1108–10, 1910, 1916; Ex. 59. Goldner's February 3 instructions and Blatt's confirmation establish the authorized expense treatment and distribution approval process. They are not separate false statements by Flow. *Id.* Ex. 65. The identified Flow emails supply the speakers, recipients, dates, medium, and substance. Read with the pleaded purpose and subsequent conduct, they give Flow notice of the particular assurance Goldner challenges and how it allegedly misled him. Throughout, Flow acted with self-interest to maintain the relationship with MegaCap.

**A. The allegations concern existing safeguards as well as the June 1 guarantee**

Flow's earlier acknowledgments concerned controls it had already accepted. Compl. ¶¶ 1108–10. Count XXXV also challenges representations about existing compliance systems and document accuracy. *Id.* ¶ 1917(b)–(c). Flow's future promise argument does not answer those allegations. The June 1 promise presents a separate question of intent when made. Goldner alleges that Flow promised to suspend work pending clear guidance while intending to favor Blatt and retain the engagement, knowing Goldner wanted another administrator. *Id.* ¶¶ 1919–21, 1926–27.

Because Florida law "treats a promisor's intent as a material existing fact," a promise of future conduct can support fraud if the speaker did not intend to perform when making it. *Citibank, N.A. v. Data Lease Financial Corp.*, 828 F.2d 686, 694 n.12 (11th Cir. 1987); *BGW Design Ltd., Inc. v. Serv. Am. Corp.*, 2010 WL 5014289, at *3 (S.D. Fla. 2010) (allowing a fraud claim based on representations made without an intention to perform).[20] Here, ¶1919 alleges knowing falsity when made, ¶1920 alleges intended inducement, and ¶1926 supplies the ***preexisting*** business motive. Taken together, the pleaded motive, Flow's knowledge of the controls, and its ensuing unilateral work support the inference of intent when Flow gave the assurance. Flow's assertion it fully performed the promise assumes Elkins's disputed position supplied required guidance. The Complaint alleges otherwise and identifies continued work ***after*** further objections. Compl. ¶¶ 1153, 1175–79, 1190–92, 1921–22.[21]

---

[20] *Biscayne Investment Group, Ltd. v. Guarantee Management Services, Inc.*, 903 So. 2d 251, 255 (Fla. 3d DCA 2005), rejects an unperformed promise standing alone. *Nodus International Bank, Inc. v. Arocha Hernandez*, 511 F. Supp. 3d 1316, 1324 (S.D. Fla. 2021), recognizes the contemporaneous intent exception but rejected an inference based only on later nonperformance.

[21] The Court cannot resolve that factual dispute by adopting Flow's preferred inference and must at this stage accept Plaintiff's Complaint as being true. Flow's assertion it fully performed the promise requires factual inferences in its favor, which is impermissible at this stage. The email required clear guidance about who was legally in charge. Flow already knew the agreed approval controls when it received Elkins's contrary assertion about MCC's control. Compl. ¶¶ 1108–10, 1905, 1910, 1918. Elkins's request to complete K-1s did not resolve the separate LP rights and access at issue. The Complaint alleges continuing work ***after*** Flow received further objections and conflicting legal positions.

**B. Goldner's demands do not negate the reliance alleged**

Mr. Goldner alleges that he relied on Flow to safeguard his MCTH interest and prevent unauthorized subscriptions. Compl. ¶ 1923. He understood that the impartiality and approval assurances would restrict both principals pending legal ***resolution***, preventing unilateral K-1 releases and further signed subscriptions. *Id.* ¶¶ 1917(d)–(e), 1918–25, 1928; Ex. 45. Paragraph 1928 specifically alleges induced forbearance from legal action against Flow. Goldner's demands and litigation against Blatt do not negate that targeted reliance or mean he abandoned his rights. Flow, therefore, misstates the requirements of fraud in saying only an action can trigger a fraud claim. Rather, the correct and complete definition requires reliance on a statement that either induces an action or causes a party to refrain from acting.

*Wilding v. DNC Services Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019), rejected reliance allegations that failed to identify which statements the named plaintiffs relied on. Here, Mr. Goldner identifies Mr. Nanney's June 1 email and alleges that it induced him to forgo legal action against Flow while Flow continued the unilateral work that injured his interests. Compl. ¶¶ 1918, 1923–29. Mr. Goldner's Flow-specific forbearance allegation supplies that connection.[22] Flow's June 6–7 calculation does not resolve reliance beginning with the June 1 assurance. Nor does Mr.

---

Compl. ¶¶ 1150–52, 1175–79, 1921–22. The Court must assess whether Flow truthfully described the safeguard it intended to apply. Elkins's letter asserted Blatt's control on MCC's purported behalf. It did ***not*** adjudicate the dispute. Goldner alleges the condition Flow announced remained unsatisfied. Compl. ¶¶ 1153, 1190–92, 1921–22. Goldner's argument rests on the announced clear guidance condition and Flow's knowledge of conflicting authority claims.

[22] *Otto Candies* requires facts connecting a particular representation to the plaintiff's decision and injury, rather than a bare assertion of reliance. 137 F.4th at 1193. Goldner's June 7 and June 26 demands and Reichard's September 11 letter invoking the June 1 email show efforts to enforce the promised safeguards. Compl. ¶¶ 1150–52, 1175–79; Ex. 46 at 1–2, 4. Those demands and his claims against Blatt do not negate forbearance toward Flow. The four elements map to the pleading as follows. Paragraphs 1917–19 allege material falsity. Paragraph 1919, read with paragraphs 1921–22 and 1926–27, alleges knowledge when made. Paragraphs 1920 and 1928 allege intended inducement. Paragraphs 1923–25 and 1928–29 allege actual reliance and resulting personal injury. Goldner alleges that reliance on Flow's promised restraint left his interest exposed to continued unilateral work, subscriptions, and exclusion. That causal link matters because fraud requires injury from reliance, not merely injury from Flow's conduct. If the Court requires more particulars about the Flow-directed action forgone, timing, or incremental injury, Goldner requests leave to supply them. A demand to honor an assurance does not itself show that the sender never relied on it.

Goldner attribute the earlier April 28 access cutoff to that later email. Compl. ¶¶ 772, 1138, 1923–29. The causal inquiry must distinguish earlier injury from harm caused by later reliance.[23]

## V. FLOW HAS NOT ESTABLISHED THAT THESE CLAIMS MUST BE ARBITRATED

### A. The Service Agreement does not automatically bind Goldner individually

The Service Agreement's arbitration provision addresses controversies "between the parties" concerning transactions under the agreement or its construction, performance, or breach. DE 75, Ex. A § 13.12. ***MCC*** executed the agreement as Flow's client. Flow must therefore establish a basis for binding Goldner individually beyond MCC's engagement. Flow's statement that MCC, not Goldner, retained it confirms why that separate inquiry is necessary. DE 75 at 10. Lack of a signature alone does not end the inquiry, but neither does MCC's signature establish Goldner's personal assent.[24]

Even under the California law Flow invokes, its equitable-estoppel theory requires examining whether Goldner's claims depend on, or are inextricably intertwined with, obligations imposed by the Service Agreement. *See JSM Tuscany, LLC v. Superior Court*, 193 Cal. App. 4th 1222, 1239–42 (2011). "[M]erely 'mak[ing] reference to' an agreement with an arbitration clause is not enough" to require arbitration. *UFCW & Employers Benefit Trust v. Sutter Health,* 241 Cal. App. 4th 909, 931 (2015) (quoting *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 218 (2009)). The duty's source controls, not the tort label or contractual setting.

---

[23] Flow calculates a one day interval between receipt of Elkins's letter on June 6 and Goldner's protest on June 7. DE 75 at 16. Flow gave the assurance on June 1, ***before*** that interval. The June 7 protest does not establish when reliance began or that every form of Flow directed forbearance ended that day. The chronology also separates the April 28 access cutoff from Flow's later conduct. Compl. ¶¶ 772, 1138. Goldner does not attribute that earlier cutoff to the June 1 email. Paragraphs 1923–29 instead connect the alleged deception to Flow's continued exclusive work with Blatt, unauthorized subscriptions, and interference with Goldner's interests.

[24] Read together, these allegations support a reasonable inference that Goldner postponed protective action against Flow in reliance on the June 1 assurance, leaving his interest exposed to the subsequent unauthorized subscriptions and continued exclusion. Compl. ¶¶ 1918, 1923–24, 1928–29.

Count XXXIII relies on direct dealings and protective undertakings beyond the original agreement. Count XXXIV alleges knowing assistance of Mr. Blatt's violation of duties arising from his own fiduciary role and the governance restrictions provided to Flow. Count XXXV alleges a particular false assurance to Mr. Goldner and his reliance. Compl. ¶¶ 1892–99, 1902–11, 1918–29. Goldner seeks tort relief for those acts. He does not ask the Court to award him MCC's contractual performance or declare him a beneficiary entitled to enforce the Service Agreement.[25] *Orellana v. Roblox Corp.,* 769 F. Supp. 3d 1273, 1287–88 (M.D. Fla. 2025) (relationship with a signatory alone insufficient to establish estoppel).

Indeed, Section 13.6 denies third parties rights and remedies under that contract, while Section 13.1 disclaims a fiduciary relationship arising from it. Those provisions underscore the need to identify the independent conduct and duty actually alleged. Flow cannot establish estoppel simply by grouping every act involving its platform under the contractual label "administrative services." Its accepted dual-approval procedure and direct assurance supply the conduct at issue without a claim that Goldner may enforce MCC's contractual rights under the Service Agreement.

*UBS Financial Services, Inc. v. Saunders*, 424 So. 3d 1013, 1016–17 (Fla. 2d DCA 2025), compelled a nonsignatory seeking contractual account services to arbitrate. Here, equitable estoppel does not apply because Goldner's claims rest on Flow's separately accepted protective duties toward him, its allegedly false June 1 assurance, and its knowing assistance of Blatt's fiduciary breaches, rather than obligations imposed by MCC's Service Agreement. *See Lubin v. Starbucks Corp.*, 122 F.4th 1314, 1318–22 (11th Cir. 2024).[26] Coverage of later formed Special

---

[25] The Complaint discusses Service Agreement in ¶1158–70 to explain why Goldner's individual claims arise independently. ¶1927 cites Flow's contractual fees as an alleged motive to favor Blatt, not as a request to award Goldner those fees or enforce MCC's bargain. Describing a contract's existence or defendant's incentive differs from claiming a personal right to its promised performance. The asserted duty and relief must be examined for each claim.

[26] Flow's principal Florida analogy, *UBS Financial Services*, 424 So. 3d at 1016–17, involved a nonsignatory demanding account services available under the governing agreement. Here Goldner challenges Flow's own alleged

Purpose Vehicles identifies the vehicles Flow could administer; it does not itself bind Mr. Goldner individually. DE 75 at 18. Flow must establish the governing instruments and an enforcement basis for each and every claim.[27] Flow's contractual presentation also leaves an unresolved gap. The parties executed a March 1, 2023 Investor Portal Statement of Work that incorporates a "Master Services Agreement" and provides that conflicting SOW terms "shall supersede and control." First Action, DE 192-3 at 1, 4. The SOW invokes Section 19.2 of that incorporated agreement for termination, while Flow's attached 2021 Service Agreement addresses termination in Section 12 and contains no Section 19.2. Compare id. at 2, § 3(e), with DE 75-1 at 10–14. Flow must identify the incorporated agreement and explain how its submitted terms govern the later portal services before treating the 2021 agreement as dispositive of those services. *See Exhibit 1 to Opposition*.

**B. The Partnership Agreement requires a separate enforcement inquiry**

According to Flow, Goldner's LP status requires considering the Partnership Agreement, even without an individual signature. DE 75, Ex. B, Series Agreement § 1.1; 6 Del. C. § 17-101(14). The separate question is whether Flow may enforce its arbitration provision against him.

---

deception, breach of accepted protective undertakings, and knowing assistance in depriving him of his rights. Although portal access and records are part of the broader factual setting, the claims require examination of those ***independent duties*** rather than a blanket assumption that any requested access enforces MCC's contract.

[27] Flow also invokes the Service Agreement's coverage of later formed Special Purpose Vehicles ("SPVs"). DE 75 at 18. That provision identifies the vehicles Flow could administer. It does not resolve whether Goldner's individual claims depend on contractual obligations that bind him to arbitrate. The Court should apply that inquiry to each count, including the alleged false assurance directed to Goldner and the alleged knowing assistance of Blatt's separate fiduciary breaches. The prior record contains a March 1, 2023 Investor Portal Statement of Work between MCC and FTS Admin, LLC, identifying MegaCap Funds, LP – Tech I. First Action, DE 192-3 at 1–4. It has no standalone arbitration clause, but expressly incorporates a Master Services Agreement, provides automatic annual renewal, and states that SOW terms control an actual conflict. Its silence does not establish that incorporated arbitration terms vanished or that it replaced every earlier agreement. Nor does the 2021 Service Agreement expire after a fixed number of years: Section 5 continues it until termination under Section 12. If Flow relies on a disputed chain of agreements or incorporated terms to bind Goldner personally, the Court should require the complete governing instruments and, if necessary, permit discovery limited to that issue before deciding enforcement. The later SOW does not itself establish a separate arbitration-free agreement for MCTH.

Section 10.10(a) broadly covers disputes relating to the Partnership or Series Agreement, including tort claims. Section 10.1 identifies the persons the agreement binds. Flow invokes the agreement as an outside administrator, rather than as a partner. The breadth of covered subject matter does not itself establish Flow's right to enforce the clause against Goldner; it was waived.

"Covered Person" status under Sections 5.7–5.8 does not automatically give an administrator every enforcement right. Flow must connect its asserted status, the applicable enforcement doctrine, and the duties at issue. The Court cannot assume disputed good faith or reliance on advice.[28] *Ishimaru v. Fung*, No. Civ. A. 929, 2005 WL 2899680, at *17–18 (Del. Ch. Oct. 26, 2005), involved agreement based obligations asserted against a nonsignatory treated as indistinguishable from a contracting entity. Goldner instead identifies Flow's own undertakings and knowing assistance.[29] *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155–57 (Del. 2002), requires attention to the source of the asserted duty even where a clause is broad and the dispute overlaps factually with the contract. Here the Partnership Agreements define Goldner's LP interest and information rights, but that background does not necessarily supply Flow's alleged obligation to refrain from knowingly assisting Blatt's separate fiduciary misconduct or making a fraudulent assurance. Identifying Goldner's interest through those documents does not itself make every tort claim contractual, especially due to Flow's omission of the February 2023 Resolutions.[30]

---

[28] Flow invokes the protections for "Covered Persons" in Sections 5.7 and 5.8. The administrator language in Section 5.7 is expressly subject to the general partner's sole discretion. Even assuming Flow qualifies for those protections, exculpation and indemnification provisions do not automatically confer every contractual enforcement right or establish that each independent tort claim is subject to arbitration at the administrator's demand.

[29] *Ishimaru v. Fung*, No. Civ. A. 929, 2005 WL 2899680, at *17–18 (Del. Ch. Oct. 26, 2005), does not dispense with that connection. There the plaintiff sought to impose agreement based obligations on a nonsignatory while treating it as indistinguishable from the contracting entity. Goldner does not allege that Flow became MCC, MCTH's general partner, or a party obliged to perform all partnership promises.

[30] Goldner also objects that Flow cannot rely solely on a litigation-waived right borrowed from MCC and/or MCTH. The Complaint describes MCC's and Blatt's election to litigate the governance dispute. Compl. ¶ 642; see DE 75 at 3 n.2. To the extent Flow claims only through MCC's right to arbitrate that same controversy, Goldner asks the Court to determine the effect of that election before allowing Flow to enforce it.

### C. Threshold consent must precede any delegation or stay

Goldner specifically contests Flow's right to enforce either arbitration agreement against him, including any delegation through the JAMS rules. Under the Service Agreement, the question is whether Flow may bind Goldner individually. Under the Partnership Agreement, the question is whether Flow may enforce the waived clause as a nonsignatory. Each requires a separate analysis under its governing law. In *Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1118–20 & n.7 (11th Cir. 2020), the Eleventh Circuit held that incorporated arbitration rules did not require an arbitrator to decide whether nonsignatory defendants could compel arbitration. The court first had to determine whether the parties had agreed to arbitrate with each other and whether equitable estoppel applied. *Lubin* likewise requires an enforceable basis to bind a nonsignatory before a delegation clause can control. 122 F.4th at 1319–21. Flow must establish that basis for each agreement it invokes here.[31]

If the Court compels arbitration of any Flow claim, Goldner requests a stay of the claim found arbitrable. Under 9 U.S.C. § 3 and *Smith v. Spizzirri*, 601 U.S. 472, 475–78 (2024), the Court must stay, rather than dismiss, a claim it sends to arbitration when a party requests a stay. Any order should identify claims and agreement it enforces and address remaining claims separately.

## VI. THE THREE COUNTS GIVE FLOW NOTICE OF THE CLAIMS AGAINST IT

Each Flow count identifies one plaintiff, one defendant, and one cause of action. Count XXXIII states the accepted responsibilities and breaches; Count XXXIV identifies Blatt's underlying wrong and Flow's assistance; Count XXXV identifies the communications, asserted falsity, inducement, reliance, and damages. Compl. ¶¶ 1885–1929. None incorporates preceding

31 Goldner also preserves his jury demand against Flow's reliance on the contractual jury waivers. The Service Agreement's waiver applies to each party, and the Partnership Agreement's waiver addresses claims between the parties. Ex. A § 13.10; Ex. B, Partnership Agreement § 10.10(e). Those waivers require their own party, enforcement, and scope analysis. The Partnership Agreement's jury waiver language is distinct from its arbitration provision in Section 10.10(a). Further, Flow continues to ignore the waiver, the MegaCap MOU, and February 2023 Resolutions.

causes of action. The common allegations also contain a separately identifiable Flow section, ¶¶1104–1210, and the counts repeat the material conduct. Flow itself concedes, "Yet Goldner's theory against Flow is straightforward." DE 75 at 2. That description, the identified facts, and the motion's detailed response to each claim support adequate notice. The prior reply attacked blanket incorporation of 999 paragraphs and counts that did not mention MCTH. First Action, DE 198 at 8. The present counts select 833 of 1,319 common paragraphs, omit 486, and expressly identify Goldner's LP rights. Compl. ¶¶ 1885–1929.

The same fourteen ranges in each count do not establish inadequate notice. *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1322–26 (11th Cir. 2015). Length alone is not dispositive. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294 n.2 (11th Cir. 2018). *Otto Candies* instructs courts to consider incorporated facts when assessing a count and recognizes that facts in complex litigation may support multiple counts. 137 F.4th at 1199–1200. Here, the selected history explains ownership, governance, and Flow's alleged knowledge and assistance. The Flow section and individual counts identify its conduct. *Inform Inc. v. Google LLC*, 2022 WL 3703958, at *4–5 (11th Cir. 2022), likewise distinguishes an understandable but lengthy complaint from a shotgun pleading. It also separates a claim's substantive sufficiency from a failure to identify the facts supporting it. Here, Flow disputes whether its acknowledgments establish a duty, whether its conduct shows knowledge, and whether the alleged assurance caused reliance injury. Those merits disputes do not establish a lack of fair notice.

The selected governance and transaction facts explain Mr. Goldner's interests, Flow's knowledge, and the breach it allegedly assisted. Rules 8(a)(2), 8(d)(1), and 10(c) require readable claims and permit incorporation. Flow identifies categories of background facts, but no particular allegation that makes a Flow count unintelligible. DE 75 at 20. The prior disposition was ***not*** a

merits ruling or an order directing correction of these claims. Flow's earlier arguments remained unadjudicated and Goldner had no notice or chance to cure. *Jackson v. Bank of America, N.A.*, 898 F.3d 1348, 1358–59 (11th Cir. 2018), examines fair notice and a meaningful opportunity to cure. Its plaintiffs did not oppose motions for a more definite statement, received an order to replead, and repeated the same incomprehensible defects. Here the Court did not reach Flow's objections, and the present counts change incorporation and expressly plead Goldner's MCTH rights.

**CONCLUSION**

Mr. Goldner respectfully requests that the Court deny Flow's Motion [DE 75] in its entirety. *Alternatively*, Mr. Goldner requests leave to amend as described above. If the Court compels arbitration of any claim, Mr. Goldner requests that it stay that claim under Section 3 of the FAA and address the remaining claims separately.

Respectfully submitted,

By: */s/ Stanley Q. Casey, Esq.*

Stanley Q. Casey, Esq.
Florida Bar No.: 1031011
LAW OFFICES OF STANLEY Q. CASEY PLLC
515 N Flagler Dr., Suite 350
West Palm Beach, FL 33401
Telephone: (305) 946-1510
Fax: (561) 468-2589
Email: scasey@sqcaseylaw.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 29th day of October 2026, a true and correct copy of the above and foregoing has been furnished, electronically, through the CM/ECF system, to all counsel of record.

By: */s/ Stanley Q. Casey, Esq.*
Stanley Q. Casey, Esq.